**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PHYLLIS CADWELL,

        Plaintiff,

                                  Case No. 14-13887

v.                                   Hon. Gerald E. Rosen

HENRY FORD HEALTH SYSTEM,

        Defendant.

_____/

**OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on      September 26, 2016     

PRESENT:    Honorable Gerald E. Rosen
                  United States District Judge

## I. INTRODUCTION

Plaintiff Phyllis Cadwell commenced this action in this Court on October 8, 2014, alleging that her former employer, Defendant Henry Ford Health System ("HFHS"), violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* by refusing to allow her to return to work following a medical leave of absence to obtain treatment for her disability.  This Court's subject matter jurisdiction rests upon Plaintiff's assertion of a claim arising under the federal

ADA. *See* 28 U.S.C. § 1331.

By motion filed on July 23, 2015, Defendant HFHS now seeks summary judgment in its favor on Plaintiff's ADA failure-to-accommodate claim. In support of this motion, Defendant argues that Plaintiff has failed as a matter of law to establish two elements of her *prima facie* case: namely, (i) that she was disabled within the meaning of the ADA or the ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), and (ii) that HFHS failed to reasonably accommodate her disability. Plaintiff filed a response in opposition to Defendant's motion on August 27, 2015, contending: (i) that the condition that necessitated a medical leave from her employment with HFHS satisfies the more lenient definition of a "disability" set forth in the ADAAA, (ii) that she qualifies as disabled even under the ADA's pre-amendment definition of this term, and (iii) that she has identified issues of fact as to whether HFHS failed to reasonably accommodate her disability by refusing to allow her to return to her existing medical assistant position following a leave of absence for treatment of her disability. Defendant then filed a September 10, 2015 reply brief to further address these points of contention.

Having reviewed the parties' briefs in support of and opposition to Defendant's motion, as well as the accompanying exhibits and the remainder of

2

the record, the Court finds that the relevant allegations, facts, and legal issues are

sufficiently presented in these written submissions, and that oral argument would

not aid the decisional process.  Accordingly, the Court will resolve Defendant's

motion "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern

District of Michigan.  This opinion and order sets forth the Court's rulings on this

motion.

## II.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Plaintiff Phyllis Cadwell was hired by Defendant Henry Ford Health System

("HFHS") in November of 2007, and worked as a medical assistant at HFHS's

West Bloomfield facility.  Plaintiff reported to the nurse supervisor for ambulatory

services, Judy McAtee, and her evaluations were conducted by the head nurse,

Patricia Champagne.

In the summer of 2008, Plaintiff began experiencing attendance issues.  She

was counseled by Ms. McAtee on June 16, 2008, and received a written warning

on July 14, 2008, in which Ms. McAtee stated that Plaintiff had violated HFHS's

attendance policy by being absent on two occasions and tardy on two other

occasions in early July.  (*See* Defendant's Motion for Summary Judgment, Ex. 3,

Written Warning.)  At her deposition, Plaintiff attributed these attendance issues to

anxiety and depression arising from the illness and July 1, 2008 death of the head

nurse, Ms. Champagne, with whom Plaintiff had become close during her employment with HFHS.  (*See* Plaintiff's Response, Ex. 1, Plaintiff's Dep. at 33-36.)

Plaintiff's mental health condition culminated in a three-day period of anxiety and depression from August 19 to August 21, 2008, during which Plaintiff remained locked in her room and did not report to work.  (*See id.* at 36-37.) Plaintiff testified that on the last day of this three-day period, August 21, she called Ms. McAtee and left a message concerning her absences.  (*See id.* at 37.)  In addition, Plaintiff's physician, Dr. Sowmithri Vasan, sent a note to Ms. McAtee stating that Plaintiff had been under her doctor's care from August 19 through August 22 for anxiety, depression, and heart palpitations, and that Plaintiff was told to return to work the following Monday, August 25.  (*See id.* at 37-39; *see also* Plaintiff's Response, Ex. 2, Certificate to Return to Work.)

When Plaintiff returned to work on August 25, she met with Ms. McAtee and was given a three-day suspension without pay for violating HFHS's attendance policy.  (*See* Plaintiff's Dep. at 37, 41; *see also* Plaintiff's Response, Ex. 5, Corrective Action.)  The violations cited by Ms. McAtee included two days when Plaintiff was tardy and three instances of "no call, no show" spanning from August 19 to August 21.  (*See* Corrective Action.)  As a result of this disciplinary

4

action, Plaintiff was suspended from August 25 until August 27, and was expected to return to work on Thursday, August 28.[1]  In addition, Ms. McAtee referred Plaintiff to HFHS's Employee Assistance Program ("EAP"), a program that Ms. McAtee described as "staffed with therapists who at no charge to the employee can help them with whatever issues they may be having."  (McAtee Dep. at 21-22.)  Ms. McAtee explained that this referral was "entirely based on [Plaintiff's] attendance," and that it was her practice to refer workers to EAP who were "close to termination" due to attendance issues.  (*Id.* at 23.)

During her three-day suspension, Plaintiff was seen by a psychotherapist affiliated with the EAP program, Connie Nesbany, who issued an August 27, 2008 note recommending that Plaintiff should remain off work from August 27 through August 29, and that she should not return to work until she was further evaluated on August 28.  (*See* Plaintiff's Response, Ex. 7, 8/27/2008 Note.)  Plaintiff called Ms. McAtee on August 27 to inform her that she would not returning to work as scheduled the following day, and Ms. McAtee also received a call from an EAP

---

[1]In its brief in support of its motion, Defendant suggests that Ms. McAtee "gave Plaintiff a break" by suspending rather than discharging her, as "termination was warranted" under HFHS's attendance policy in light of "Plaintiff's three day no-call/no-show."  (Defendant's Motion, Br. in Support at 4.)  As Plaintiff observes, however, Ms. McAtee testified that she was informed by the human resources department that because Plaintiff called to report her absence on August 21, she did not violate HFHS's three day no-call/no-show policy.  (*See* Plaintiff's Response, Ex. 3, McAtee Dep. at 21.)

representative confirming that Plaintiff would not be reporting to work on August

28.  (*See* McAtee Dep. at 31-32.)

Plaintiff was seen by another HFHS medical professional, Dr. Agnes

Wrobel, on August 28, 2008, but the parties dispute what transpired after this visit.

Plaintiff testified that she attempted to contact Ms. McAtee on Friday, August 29

to discuss her anticipated return to work on Tuesday, September 2, following the

Labor Day holiday weekend, but that she was unable to reach her supervisor and

instead spoke to the head nurse, Mary Lou Trevino.  (Plaintiff's Dep. at 44.)

Plaintiff then called an HFHS human resources representative, Karen Allen, who

informed her that "it didn't make any sense" for Plaintiff to report to work the

following week because she "no longer had a position" to which she could return.

(*Id.* at 44-45, 47.)  According to Plaintiff, upon learning from Ms. Allen that she

had "no other options," (Plaintiff's Response Br. at 12), she submitted a request

for a medical leave of absence until September 16, 2008 for treatment of her

depression, along with an updated "return to work" letter from her physician, Dr.

Wrobel, recommending that Plaintiff should remain off work from August 27 to

September 16, and stating that Plaintiff's ability to return to work would be

reevaluated on September 16.  (*See* Plaintiff's Dep. at 45, 47-49; *see also*

Defendant's Motion, Ex. 9, Request for Leave of Absence; Ex. 8, 8/28/2008

6

Return to Work Letter.)

Defendant, however, views the record somewhat differently. Most notably, Defendant evidently contends that it was only **after** Plaintiff submitted her request for a medical leave of absence and accompanying note from Dr. Wrobel that Defendant's human resources representative, Ms. Allen, informed both Plaintiff and her supervisor that Plaintiff's position was not guaranteed and might not be available upon her return from medical leave. In support of this contention, Defendant points to an undated letter sent by Ms. Allen to Plaintiff, stating (i) that Plaintiff's supervisor had received a note from Plaintiff's physician on September 2, 2008, indicating that Plaintiff was unable to return to work until she was further evaluated on September 16, 2008, and (ii) that in light of this doctor's note, Plaintiff would be granted up to six months of medical leave until she was able to return to work, but that her position was "no longer guaranteed" during this leave. (Defendant's Motion, Ex. 11, Allen Letter to Plaintiff.)[2] Similarly, Defendant has submitted the declaration of Ms. McAtee, stating (i) that after Plaintiff advised her on August 27, 2008 that she would not be returning to work the following day, she "heard nothing" from Plaintiff until she received Plaintiff's request for a medical

---

[2]Ms. Allen further advised Plaintiff in this letter that because Plaintiff had been employed by HFHS for less than 12 months, she was ineligible for a leave of absence under the Family and Medical Leave Act. (*See id.*)

leave and accompanying doctor's note indicating that Plaintiff would be unable to return to work before September 16, 2008, (ii) that she was "subsequently informed" by Ms. Allen that Plaintiff's request for a medical leave had been granted but that her "position would not be guaranteed," (iii) that she then "submitted a request to refill [Plaintiff's] position" but was informed that the position could not be filled due to a hiring freeze, and (iv) that Plaintiff's job duties therefore had to be assumed by other employees.  (Defendant's Motion, Ex. 18, McAtee Decl. at ¶¶ 6-9.)[3]

Notwithstanding these divergent readings of the record, the parties agree that Plaintiff obtained another note from Dr. Wrobel recommending that she remain off work until her next scheduled evaluation on September 25, 2008.  (*See* Plaintiff's Dep. at 51; *see also* Defendant's Motion, Ex. 12, 9/16/2008 Return to Work Letter.)  Plaintiff testified that she was ready and able to return to work on September 16, but that HFHS again would not allow her to resume her prior medical assistant position.  (*See* Plaintiff's Dep. at 50.)  Accordingly, Plaintiff's physician extended her time off work through September 25, opining that Plaintiff

---

[3]Defendant also notes that despite Plaintiff's assertion that she was ready to return to work on September 2, she applied for disability benefits on September 4, 2008 and subsequently received these benefits for about six weeks.  (*See* Defendant's Motion, Ex. 10, Intake Interview Questions; *see also* Plaintiff's Dep. at 56, 69-72.)

8

was "slipping" and "not doing so well" due to the "back and forth" she was getting from HFHS when she sought to return to her job. (*Id.* at 51-52.)

Following an examination on September 25, Dr. Wrobel issued a note stating that Plaintiff would be able to return to work with no restrictions on September 29. (*See* Defendant's Motion, Ex. 14, 9/25/2008 Return to Work Letter.) Plaintiff then contacted Ms. Allen, but was again told that her position was no longer available, and that she instead would have to apply for other positions at HFHS as they were posted. (*See* Plaintiff's Dep. at 65.) Plaintiff testified that she applied for various open positions over the next several months, but was not selected for any of them. (*See id.* at 66.)

As of September 29, 2008, Plaintiff's medical leave was converted to a personal leave of absence. Ms. Allen advised Plaintiff in a September 19, 2008 letter that this personal leave of absence, combined with Plaintiff's earlier medical leave, could not exceed one year, and she again reminded Plaintiff that her medical assistant position was not guaranteed but that she could apply for positions posted on the HFHS website. (*See* Defendant's Motion, Ex. 13, 9/19/2008 Letter.) Upon the expiration of this one-year period, HFHS terminated Plaintiff's employment on August 27, 2009.

Plaintiff filed a charge with the Equal Employment Opportunity

Commission ("EEOC") on August 4, 2009, initially complaining that she had been discriminated against due to her race, but later amending this charge to allege that Defendant HFHS failed to reasonably accommodate her disability.  (*See* Defendant's Motion, Ex. 15, EEOC Charge; *see also* Plaintiff's Dep. at 77.) Following a lengthy investigation, the EEOC initially issued a March 19, 2014 determination that there was "reason to believe that violations have occurred," and presented the parties with a proposed conciliation agreement "containing the types of relief necessary to remedy" these violations.  (Plaintiff's Response, Ex. 10, 3/19/2014 Determination at 2.)  The Commission then reversed course, however, dismissing  Plaintiff's charge on July 11, 2014 upon determining that it was "unable to conclude that the information obtained establishes violations of" the pertinent federal statutes, including the ADA.  (Defendant's Motion, Ex. 16, 7/11/2014 Dismissal and Notice of Rights.)  Plaintiff commenced the present suit roughly three months later, on October 8, 2014, alleging that Defendant HFHS failed to reasonably accommodate her disability as mandated under the ADA.

### III.  ANALYSIS

A.    **The Standards Governing Defendant's Motion**

Through the present motion, Defendant HFHS seeks an award of summary judgment in its favor on Plaintiff's federal ADA claim that HFHS failed to

10

reasonably accommodate her disability.  Under the pertinent Federal Rule, summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the Supreme Court explained many years ago, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R.

11

Civ. P. 56(c)(4).  Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

## B.  Plaintiff Cannot Establish That She Had a Disability Under the ADA.

As the sole claim advanced in her complaint, Plaintiff alleges that Defendant HFHS breached its obligation under the ADA to reasonably accommodate her disability.  *See* 42 U.S.C. § 12112(b)(5)(A) (defining disability discrimination under the ADA as encompassing an employer's failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business.").  In order to establish a *prima facie* case of HFHS's failure to make the reasonable accommodations mandated by the ADA, Plaintiff must show (i) that she had a disability within the meaning of the ADA, (ii) that she was otherwise qualified for her job, and (iii) that HFHS refused to make a reasonable accommodation for her disability.  *See Smith v. Ameritech,* 129 F.3d 857, 866 (6th Cir. 1997); *Murphy v. Henry Ford Health System,* No. 11-12425, 2013 WL 791290, at *17 (E.D. Mich. Feb. 5, 2013).  In its present motion,

12

Defendant challenges Plaintiff's showing as to the first and third prongs of this *prima facie* standard, arguing (i) that Plaintiff's condition does not meet the ADA's definition of a "disability," and (ii) that as a matter of law, HFHS reasonably accommodated any such disability.

Turning first to the question whether Plaintiff suffered from a "disability" within the meaning of the ADA at the time of the events giving rise to her failure-to-accommodate claim, the Court must determine as a threshold matter whether to apply the ADA's pre-amendment definition of "disability" or the more expansive construction of this term as dictated by the ADAAA. As pertinent to this case, the ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1)(A).[4] Although the ADAAA did not expressly redefine this term, it supplied a number of "[r]ules of construction" that, among other things, dictate that the statutory definition of disability "shall be construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of" the statute. 42 U.S.C. § 12102(4)(A). In addition, while the Supreme Court had held that an impairment must have a "permanent or long term impact"

---

[4]The ADA's definition of a "disability" also encompasses "a record of such an impairment" and "being regarded as having such an impairment," 42 U.S.C. § 12102(1)(B)-(C), but neither of these prongs of the statutory definition is applicable here.

in order to qualify as disabling under the ADA, *Toyota Motor Manufacturing, Inc. v. Williams,* 534 U.S. 184, 198, 122 S. Ct. 681, 691 (2002), the ADAAA overruled this aspect of the *Toyota* decision (among others), providing that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D); *see also Spence v. Donahoe,* No. 11-3203, 515 F. App'x 561, 569 (6th Cir. Feb. 21, 2013) (recognizing that the ADAAA "expressly overruled" *Toyota's* holding that "temporary physical conditions do not generally constitute substantial impairments").

The ADAAA took effect on January 1, 2009, and the Sixth Circuit has held that its amendments do not "apply retroactively to govern conduct occurring before the Act became effective." *Milholland v. Sumner County Board of Education,* 569 F.3d 562, 565 (6th Cir. 2009); *see also Spence,* 515 F. App'x at 569. In this case, Plaintiff's physicians recommended that she remain off work from August 19 through September 25, 2008 due to anxiety and depression, but then stated that she could return to work without restriction as of September 29, 2008. Similarly, Plaintiff testified that she was capable of resuming the full duties of her job as of the end of September of 2008, if not earlier. (*See* Plaintiff's Dep. at 54, 75-76.) Moreover, the failure to accommodate cited by Plaintiff as giving rise to her ADA claim occurred in September of 2008, when she was advised that

14

her existing position as a medical assistant was no longer available to her upon her return from medical leave.  (*See* Complaint at ¶¶ 19, 21-22 (citing HFHS's "refus[al] to allow [Plaintiff] to return to work from a leave of absence related to her disability," and alleging that "allowing [Plaintiff] to take a leave of absence" and then "return to her position as a medical assistant" following this leave "would not have created an undue hardship for" HFHS); Plaintiff's Response Br. at 22-23 (explaining that the accommodation sought by Plaintiff was a "reasonable medical leave," and opining that "a medical leave where there is no job to return to is not a medical leave").)  Because the conduct identified by Plaintiff as giving rise to her ADA claim had all occurred by the end of September of 2008, at the latest, it follows that the ADAAA's more expansive interpretation of the term "disability" is not applicable here.

In an effort to avoid this result, Plaintiff notes that her employment with HFHS was not actually terminated until August 27, 2009, and she contends that this adverse employment action after the January 1, 2009 effective date of the ADAAA operates to bring her claim within the ambit of this statute.  Yet, Plaintiff is pursuing only a failure-to-accommodate claim, and not a claim of discriminatory discharge.  As Plaintiff herself testified at her deposition, she was effectively "terminated" from her position at HFHS when her employer refused to "let [her]

15

come back to work" in September of 2008, and when a human resources representative, Karen Allen, told her at that time that she "no longer had a job." (Plaintiff's Dep. at 53-54.) While Plaintiff remained on personal leave from late September of 2008 until August 27, 2009, when she exhausted the one year of leave available to her under HFHS's policies and practices, the termination of her employment in August of 2009 was only the final **_effect_** of Defendant's alleged violation of the ADA — *i.e.,* its failure to accommodate Plaintiff's disability — as opposed to discrete, actionable conduct giving rise to Plaintiff's ADA claim. Accordingly, the Court finds that Plaintiff's claim is governed by the legal standards in effect prior to the enactment of the ADAAA.[5]

---

[5]Even assuming that Plaintiff's August 27, 2009 discharge qualified as discrete conduct by HFHS that could be viewed as a additional failure to reasonably accommodate Plaintiff's disability, the Sixth Circuit has held that a bifurcated analysis would be appropriate under these circumstances, with the pre-amendment ADA applicable to "events occurring before January 1, 2009" and the ADAAA standards governing "events occurring in and after 2009." *Wurzel v. Whirlpool Corp.,* No. 10-3629, 482 F. App'x 1, 10 (6th Cir. April 27, 2012). This approach would be unavailing to Plaintiff, however, as there is no support in the record for treating her discharge as a failure to reasonably accommodate her disability. Rather, as this Court explained in *Murphy,* 2013 WL 791290, at *11 n.16, *18 — a case in which, notably, the plaintiff was terminated upon exhausting the one year of leave time made available to her under the very same HFHS policies and practices that triggered Plaintiff's discharge here — the ADA imposes no obligation on an employer to keep an employee on indefinite leave until a position becomes available. Accordingly, so long as Defendant HFHS applies its one-year leave policy uniformly — and Plaintiff has not produced any evidence to the contrary — it may discharge an employee who exhausts this one year of leave without running afoul of the duty of reasonable accommodation imposed under the ADA.

This being the case, the Court concludes that Plaintiff has failed as a matter of law to establish that she suffered from a disability within the meaning of the pre-amendment version of the ADA, such that Defendant HFHS had a duty to reasonably accommodate her condition.  As noted earlier, under the ADA as construed by the Supreme Court prior to its amendment, an impairment did not qualify as disabling absent a "permanent or long term impact," *Toyota,* 534 U.S. at 198, 122 S. Ct. at 691, and the Sixth Circuit likewise recognized that "[g]enerally, short-term, temporary restrictions are not substantially limiting," *Roush v. Weastec, Inc.,* 96 F.3d 840, 843 (6th Cir. 1996).  Thus, the Sixth Circuit held in *Spence,* 515 F. App'x at 569, that an impairment that "lasted for seven months" did not qualify as disabling under the pre-amendment ADA, where the plaintiff thereafter was "released to full duty" and his doctor did not "suggest[] that [his] impairment would be permanent."  Similarly, in *Cardenas-Meade v. Pfizer, Inc.,* No. 12-5043, 510 F. App'x 367, 368 (6th Cir. Jan. 3, 2013), a physician diagnosed the plaintiff as suffering from "severe anxiety and depression" that was caused by the "emotional trauma" of a so-called "Phase VI" assessment undergone by trainees for sales representative positions at defendant Pfizer.  The court found that the plaintiff's condition was not disabling under the pre-amendment ADA, where she failed to produce "evidence that the limits on her non-work activities

17

were anything more than a short-term, temporary result of the anxiety and depression triggered by actions leading up to and during her failed Phase VI examination," and where there likewise was no "evidence in the record" that the plaintiff's treating physicians "considered her anxiety and depression to be a permanent condition or one with a long term impact." *Cardenas-Meade,* 510 F. App'x at 371 (internal quotation marks and citation omitted).

As in these cases, the record here fails as a matter of law to demonstrate that Plaintiff's mental health condition extended beyond a short-term, temporary impairment. According to Plaintiff's deposition testimony and the notes from her physicians, Plaintiff suffered from anxiety and depression that kept her off work from August 19 until September 29, 2008, at the latest. (*See* Plaintiff's Dep. at 63; *see also* Defendant's Motion, Ex. 5, 8/19/2008 Return to Work Note; Ex. 8, 8/28/2008 Return to Work Letter; Ex. 12, 9/16/2008 Return to Work Letter.) Plaintiff testified that as of late September of 2008, if not earlier, she was capable of resuming her full duties as a medical assistant, (*see* Plaintiff's Dep. at 75),[6] and her doctor likewise stated that she could return to work with no restrictions as of

---

[6]Indeed, Plaintiff indicated at her deposition that she sought to return to work on September 2 and again on September 16, and that she would have done so if HFHS had not advised her that her medical assistant position was no longer available. (*See id.* at 43-45, 50.)

18

September 29, 2008, (*see* Defendant's Motion, Ex. 14, 9/25/2008 Return to Work

Letter).  Thus, Plaintiff agreed at her deposition that she was incapacitated from

working for roughly a month.  (*See* Plaintiff's Dep. at 76.)  As demonstrated by the

above-cited case law, this short-term condition triggered by the illness and death

of a co-worker does not rise to the level of "substantially limit[ing]" under the pre-

amendment ADA's definition of a "disability."

Plaintiff insists, however, that her inability to work in August and

September of 2008 is more properly attributable to a "flare-up" of an underlying

long-term condition.  (Plaintiff's Response Br. at 21-22.)  In support of this

reading of the record, Plaintiff points to the Sixth Circuit's decision in *Cehrs v.*

*Northeast Ohio Alzheimer's Research Center,* 155 F.3d 775, 777 (6th Cir. 1998),

in which the plaintiff suffered "[f]or thirty years" from "chronic generalized

pustular psoriasis and psoriatic arthritis."  When this disease was in its "dormant

stage," the plaintiff "receive[d] medical treatment on a weekly basis to control" his

condition.  *Cehrs,* 155 F.3d at 777.  During its occasional "flare-ups," however,

this condition could be "life threatening," and it left the plaintiff "completely

unable to work" from November of 1993 until March of 1994.  155 F.3d at 777-

78.  The defendant employer terminated the plaintiff's employment just before her

physician determined that she could return to work, claiming that she had

exhausted her medical leave and had "failed to complete the required paperwork to extend" this leave.  155 F.3d at 778.

Although the district court did not reach the question whether the plaintiff was disabled within the meaning of the ADA, the defendant employer argued on appeal that because the plaintiff was limited "only during 'flare-ups'" of her condition, her impairment was too "transitory [in] nature" to qualify as a disability. 155 F.3d at 780.  The court disagreed, reasoning that the plaintiff's flare-ups were "manifestations" of an underlying long-term condition.  155 F.3d at 780.  The court explained that it was "not necessary that [the plaintiff] experience flare-ups on a daily basis in order to characterize" her condition as disabling under the ADA, and that it instead was sufficient that her condition was "ongoing" and had a "physiological impact even during its dormant stage."  155 F.3d at 780.

The Court agrees with Defendant that *Cehrs* is readily distinguishable here. First and foremost, while the plaintiff in *Cehrs* produced evidence of a condition from which she had suffered "[f]or thirty years" and for which she had received treatment "on a weekly basis," even when the disease was in its dormant stage, *Cehrs,* 155 F.3d at 777, the record here lacks any such evidence (i) that Plaintiff has been diagnosed by a physician as suffering from a long-term mental health condition, or (ii) that she has received regular treatment for this condition over a

20

sustained period.  Rather, Plaintiff testified that she received treatment from physicians for about seven months in 2008-09 for the anxiety and depression that caused her to miss work in August and September of 2008, and that after this course of treatment she "felt better" and "never pursued it" further.  (Plaintiff's Dep. at 74-75.)  In addition, while the record includes notes from Plaintiff's physicians stating that she was unable to work between August 19 and September 29, 2008, Plaintiff has not produced a note from any of her physicians, nor any other comparable medical evidence, indicating that the anxiety and depression that precluded her from working for this several-week period were manifestations of a long-term or chronic mental health condition.  *Compare Deister v. AAA Auto Club of Michigan,* 91 F. Supp.2d 905, 917-18 (E.D. Mich. 2015) (finding sufficient evidence in the record that the plaintiff's condition was more than merely temporary, where the plaintiff's psychiatrist had "diagnosed him with 'recurrent' depression," and where the plaintiff had to meet only the "low threshold for a qualified disability under the amended ADA"), *aff'd,* 647 F. App'x 652 (6th Cir. May 11, 2016).

To be sure, Plaintiff testified that she again suffered anxiety attacks and "had trouble sleeping" in April of 2015, expressing her belief that these difficulties were triggered by her then-upcoming deposition in this case and her

21

renewed thoughts of her deceased co-worker and friend.  (Plaintiff's Dep. at 82-
83.)  In light of these symptoms, Plaintiff began seeing a psychotherapist — albeit
only once — and was prescribed medication.  (*See id.* at 82-83.)  Yet, while
Plaintiff and her counsel characterize this testimony as proof of "an underlying
condition [with] intermittent flare-ups," just as in *Cehrs,* (Plaintiff's Response Br.
at 22), the missing piece here that distinguishes this case from *Cehrs* is the
absence of ***medical evidence*** suggesting that Plaintiff suffers from a chronic or
long-term condition.  It goes without saying that Plaintiff is not qualified to give a
medical opinion as to whether the episodes of anxiety described in her deposition
testimony are manifestations of an underlying long-term condition, *see Murphy,*
2013 WL 791290, at *14 n.22, and nothing in the record would permit the Court
to draw this inference.

Accordingly, the Court finds that Plaintiff cannot establish the first prong of
her *prima facie* case of a failure to accommodate her disability — namely, that she
was "disabled" as that term is defined under the pre-amendment version of the
ADA.[7]  It follows that Defendant is entitled to an award of summary judgment in

_____

[7]Although the question is a closer one, the Court believes the outcome would be
the same if Plaintiff's claim were analyzed under the ADAAA's more expansive
definition of a "disability."  As observed earlier, the ADAAA mandates that the term
"disability . . . shall be construed in favor of broad coverage of individuals" under the
ADA.  42 U.S.C. § 12102(4)(A).  Moreover, an impairment qualifies as a disability even
if it is "episodic or in remission," so long as "it would substantially limit a major life

its favor on Plaintiff's failure-to-accommodate claim under the ADA.[8]

---

activity when active." 42 U.S.C. § 12102(4)(D); *see also* 29 C.F.R. § 1630.2(j)(1)(ix) ("The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section."). In Plaintiff's view, her mental health condition qualifies as "episodic" under this ADAAA provision, and it evidently had a substantial effect on one or more major life activities in late July and August of 2008, when this impairment left her unable to leave her room for three consecutive days and incapable of performing her job for a month or more.

Even when weighed against the ADAAA's more expansive definition of a "disability," however, Plaintiff still relies exclusively on her own deposition testimony and the assertions of her counsel to establish that her mental health condition is "episodic" in nature and features occasional "flare-ups." As already discussed, this record consists of (i) Plaintiff's testimony that she received treatment for several months in 2008-09 for anxiety and depression, after which she "felt better" and did not pursue further treatment, (Plaintiff's Dep. at 74-75), (ii) notes from Plaintiff's physicians indicating that she was unable to work between August 19 and September 28, 2008, (*see* Defendant's Motion, Exs. 5, 8, 12, 14) — with, notably, only the first of these notes identifying anxiety and depression as the conditions that kept Plaintiff from working, and (iii) Plaintiff's testimony that she again experienced anxiety attacks and difficulty sleeping several years later, in April of 2015, leading her to visit a psychotherapist (once) and to resume two prescription medications, (*see* Plaintiff's Dep. at 82-84).

Nothing in this record reflects the diagnosis of a medical professional that Plaintiff's mental health condition is ongoing and episodic in nature. Nor, apart from a single instance in August of 2008, has any of Plaintiff's treating physicians offered an opinion that Plaintiff's condition, when active, prevents her from working or otherwise substantially limits a major life activity. As the courts have observed, while the ADAAA expanded the definition of a "disability," and while medical evidence is not invariably required to meet this more lenient standard, claims of an ascertainable medical condition and limitations attributable to this impairment sometimes cannot be established solely through a plaintiff's own testimony, but instead must be supported through the diagnosis and opinions of medical professionals. *See, e.g., Felkins v. City of Lakewood,* 774 F.3d 647, 651-53 (10th Cir. 2014); *Vaughan v. World Changers Church International, Inc.,* No. 13-0746-AT, 2014 WL 4978439, at *8-*10 (N.D. Ga. Sept. 16, 2014); *Poper v. SCA Americas, Inc.,* No. 10-3201, 2012 WL 3288111, at *8-*9 (E.D. Pa. Aug. 13, 2012). Likewise, the Court finds in this case that the record fails as a matter of law to support Plaintiff's claim of an episodic condition that, when active, substantially limits one or more of her major life activities.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's July 23, 2015 motion for

summary judgment (docket #13) is GRANTED.


s/Gerald E. Rosen<u>          </u>
United States District Judge

Dated:  September 26, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 26, 2016, by electronic and/or ordinary mail.

s/Julie Owens<u>           </u>
Case Manager, (313) 234-5135

---

[8]In light of the Court's conclusion that Plaintiff has failed to establish the first prong of a *prima facie* case as to her claim that Defendant HFHS failed to reasonably accommodate her disability, the Court need not address Defendant's additional contention that it reasonably accommodated Plaintiff's alleged disability.